UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

PHILLIP A. SILIGMUELLER,

        Plaintiff,

        v.                          Case No. 02-C-1080

CUTLER-HAMMER, INC.,
EATON CORPORATION,

        Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE

This case comes before the court on defendant's motion for summary judgment. Plaintiff, Phillip A. Siligmueller, alleges that defendants violated his rights under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq, when they terminated him as part of a reduction in force when he was 53. Because Siligmueller has not carried his burden of showing that the legitimate, nondiscriminatory reason for termination was pretextual, defendants' motion for summary judgment will be granted.

### STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.

Ct. 2505, 91 L. Ed. 2d 202 (1986).

No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. *Ritchie v. Glidden Co.*, 242 F.3d 713, 720 (7th Cir. 2001). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*., 387 F.3d 921, 924 (7th Cir. 2004).

FINDINGS OF FACT

Eaton Electrical, Inc., formerly known as Cutler-Hammer, Inc., is a corporation organized under the laws of the State of Delaware, with a principal place of business located in Pittsburgh, Pennsylvania. Eaton Electrical is a leader in power distribution, power protection, and power equipment maintenance. (Aff. Spiker, ¶ 4)

Eaton Corporation is organized under the laws of the State of Ohio, with a principal place of business located in Cleveland, Ohio. Eaton manufactures, sells and distributes a wide variety of industrial components for the automotive, aerospace, defense, heavy equipment, commercial, and residential industries. (Aff. Spiker, ¶ 5)

Eaton hired Siligmueller on October 22, 1984, as a District Sales Manager. (Aff. Spiker, ¶ 7; Dep. Siligmueller, ¶ 49) Throughout his tenure at Eaton, Siligmueller moved through a variety of sales positions at Eaton in Illinois and Wisconsin and worked under a number of different managers. (Dep. Siligmueller, Exs. 3-18, 20)

Eaton employees receive performance appraisals on an annual basis. (Dep. Halferty, pp. 15-16) Generally the appraisals are conducted for the preceding calendar year. (*Id.*) Employees are rated against different objectives and criteria like business

acumen, drive for results, providing leadership, holding people accountable, organization, and teamwork skills. (Dep. Siligmueller, Exs. 3-18, 20) Also, employees must complete a self-evaluation as part of the performance appraisal process. (Dep. Halferty, p. 73)

Siligmueller has been rated consistently at or around "competent," or "fully qualified," the ratings signifying that the employee is meeting expectations. (Dep. Siligmueller Exs. 4, 5, 6, 7, 8, 9, 12, 16, 17, 18) On at least four occasions between 1989 and 1992, Siligmueller received a "commendable" or "outstanding" rating. (Aff. E. Campion Kersten, Exs. D and E)

Siligmueller received the following commentary on his 1985 performance appraisal:

> To improve job performance: (1) Needs special instruction on "coaching" as a sales manager.
>
> To enhance promotability: (2) Improved supervisory skills.

(Dep. Siligmueller, pp. 59-60; Dep. Ex. 5) Nevertheless, his performance was described as follows: "While order results fell short of objective, Phil has made a major contribution in his first year with the company." (Aff. Kruse, Ex. H)

On his 1986 performance appraisal, Siligmueller received the following commentary: "Leadership and coaching skills will improve with additional supervision experience." (Dep. Siligmueller, p. 62, Ex. 6) Comments included: "Greatest success this year has been in uncovering and developing new business opportunities. During this year Phil has been brought along and groomed for his next assignment - Regional Sales Manager." (Dep. Siligmueller, Ex. 6)

In 1987, Siligmueller's supervisor stated: "1987 was Phil's first year as a Regional Manager with broad supervision responsibilities. It was a learning experience ...

Overall a good effort with results somewhat less than expected in terms of territory performance." (Dep. Siligmueller, Ex. 9) To improve job performance, Siligmueller was told to focus on "Understanding/developing sales personnel management skills." (Dep. Siligmueller, p. 66; Ex. 9)

In 1989, Siligmueller received an overall commendable rating, but was rated "general satisfactory," which is below competent, in the category of "planning and development of people." (Dep. Siligmueller, p. 69; Ex. 11) Similarly, he received overall commendable ratings in 1991 and 1992, with the following commentary:

> Phil needs to better develop a working relationship with Area Sales Managers and Sales Engineers.
>
> Phil needs to improve his selling relationship with the ICPDO sales force.

(Dep. Siligmueller, p. 76; Exs. 14, 15)

In early 2000, Siligmueller was given what would be his last performance review covering the year 1999. He was short of his goal of a 30% increase in sales over the previous year, but his supervisor noted that he met and exceeded his sales goal for the Eclipse Product by 18%. He was rated as "exceeding standards" with respect to business acumen, but "needs development" in the areas of adaptability, communication and influence, building an effective team, developing and motivating others, and teamwork skills. (Dep. Siligmueller, pp. 93-97; Ex. 18)

In his 1999 self-assessment, Siligmueller agreed he needed development in building an effective team and teamwork skills. (*Id.*) Further, he received the following commentary:

> <u>Personal Value Added</u> - Here Phil and I did not agree. Phil is comfortable seeking out new challenges and acts on the

> opportunity or problem but he sometimes has a tendency to allow others to slow him down. He needs to take the initiative more often to insure that all goals are met.
>
> <u>Adaptability</u> - Again we did not agree. Phil accepts the need to try different approaches but must be directed to do so. He needs to develop a think out of the box attitude and challenge the status quo more.
>
> <u>Communicating and Influencing</u> - Phil felt he was at standard but during our conversation he realized through his own examples that he need [sic] improvement. He must take the initative to insure that others buy in to what he is trying to accomplish and support his effort. He communicates effectively externally with customers but internally he will be swayed by "they don't report to me syndrome."
>
> <u>Building Effective Teams</u> - We both agree Phil needs development in this area. He works well alone, knows who to go to get help but again tends to do the work himself rather then [sic] rely on others for support.
>
> <u>Developing and Motivating Others</u> - Though we disagreed I felt Phil recognizes that he has to work on his need to look beyond his own area internally and motivate others to support his efforts.

(*Id.*) Siligmueller agreed that he prefers to work independently of others and acknowledged that he prefers to work through managers, as opposed to lower-level employees, to help him achieve his objectives. (Dep. Siligmueller, pp. 95-97) He understood that his supervisor disagreed with his approach and wanted to work with lower level employees to help him achieve his goals. (*Id.*, at 97) Siligmueller did not disagree with or challenge any of the ratings or comments he received on any performance appraisal. (*Id.*, at 53-54, 57, 62, 65, 69-70, 82, 83, 91)

In 2000, Siligmueller learned from a former supervisor, Charles Stuhr, about an Industry Manager position in the Commercial Marketing Group of the Industrial Controls Division in Eaton's Milwaukee, Wisconsin facility. (Dep. Siligmueller, pp. 99-100) The

hiring manager for the Industry Manager position was Patrick Ferrang, OEM Segment Marketing Manager. (*Id.*, at p. 100; Dep. Ferrang, pp. 7, 15) Ferrang interviewed Siligmueller over the phone and in a face-to-face interview. (Dep. Ferrang, p. 8)

In making his decision to offer the Industry Manager position to Siligmueller, Ferrang did not consult prior performance appraisals, but relied on Stuhr's recommendation. (*Id.*, at 10-11) Ferrang hired Siligmueller, age 52, effective February 24, 2000. (*Id.*, at 10; Dep. Ferrang Ex. 1; Aff. Spiker, ¶ 8) Siligmueller reported directly to Ferrang, and Ferrang was located in Cherrington, Pennsylvania. (Dep. Ferrang, p. 10; Dep. Siligmueller, p. 100)

Siligmueller was assigned as Industry Manager for the Western zone, which primarily consisted of the western United States. (Dep. Siligmueller, pp. 102-103) His position required him to work with the general sales force and district managers in the Western zone. (*Id.*, at 103) Part of Siligmueller's responsibility was to energize and motivate the general sales force to generate sales of industrial control components. (Dep. Ferrang, p. 52) Also, Siligmueller was responsible for two national industries, Man Lift and Car Wash. (Dep. Siligmueller, p. 109)

Ferrang did not complete a performance appraisal for Siligmueller for calendar year 2000. (*Id.*, at 70) Approximately half of the Commercial Marketing Group did not receive year 2000 performance appraisals from Ferrang. (*Id.*, at 119; Dep. Halferty, pp. 32-33) Siligmueller completed a self-assessment for calendar year 2000 and identified for himself the competencies of "leveraging resources" and "holding self and others accountable" as areas in which he needed development. (Dep. Siligmueller, Ex. 20) Further, Siligmueller stated that he needed development in the area of motivation and motivating others, and time and project management. (Dep. Siligmueller, p. 181)

Financially, the year 2001 was difficult for Eaton. Net sales fell over $1 billion from 2000 to 2001. (Amended Aff. Spiker, ¶ 13, Ex. M) To compensate for the losses in sales, Eaton undertook a restructuring. (*Id.*) In 2001, Eaton closed 17 manufacturing plants and incurred an 18% reduction in total employment. (*Id.*) In July of 2001, Stacy Kardos, a Regional Marketing Manager in the Commercial Marketing Group was selected for a reduction in force. (Dep. Ferrang, p. 17; Dep. Siligmueller, pp. 128-129) Kardos, who was born on June 12, 1973, was 28 years old at the time of her discharge. (Aff. Spiker, ¶¶ 10-11) After the elimination of Kardos' position, seven people remained in the Commercial Marketing Group under the supervision of Ferrang:

|  | TITLE | AGE IN 2001 | OFFICE LOCATION |
|---|---|---|---|
| Robby Armstrong | Industry Manager | 33 | Birmingham, AL |
| Dennis Hevey | Industry Manager | 58 | Milwaukee, WI |
| Thomas Meyers | Industry Manager | 47 | Cleveland, OH |
| Joe Janocsko | Industry Manager | 36 | Cherrington, PA |
| Phillip Siligmueller | Industry Manager | 53 | Milwaukee, WI |
| Charles Stuhr | Commercial Marketing Director | 56 | Milwaukee, WI |
| Sandi Kraus | Regional Marketing Director | 30 | Milwaukee, WI |

(Dep. Halferty, Ex. 1, p. 2; Dep. Ferrang, pp. 47-48)

In October of 2001, Ferrang was told that two people from the Commercial Marketing Group had to be discharged. (Dep. Ferrang, pp. 20-21, 24) Ferrang understood the rationale behind the decision because his sales force was on the front line of revenue generation and therefore, was partially responsible for the losses. (*Id.*, at 24) The

employees in the Commercial Marketing Group, including Siligmueller, heard rumors that another work force reduction affecting their group was coming in the fall of 2001. (Dep. Siligmueller, pp. 124-128)

The criteria applied to the November 2001 reduction in force was developed and distributed by Eaton's corporation Human Resources Department. (Dep. Halferty, p. 89; Aff. Spiker, ¶ 12) The criteria and weightings applied to the Commercial Marketing Group were:

      (a)      skills necessary after the reduction (x10);

      (b)      ability to learn new skills (x5);

      (c)      ability to achieve results in the current role (x2); and

      (d)      ability to work in teams (x1).

(Dep. Halferty, Ex. 7, p. 5; Dep. Ferrang, pp. 45-47) The skills necessary after the reduction criteria were further broken down into five skills that were ranked individually, averaged, and weighted. (Dep. Halferty, Ex. 7, p. 5; Dep. Ferrang, p. 50) The considered skills were: leveraging resources, change and adaptability, motivating others, developing others, and professional presence. (*Id.*) Each employee in the Commercial Marketing Group was rated on each criterion and skill on a scale of one to three, with "1" meaning does not meet, "2" meaning fully meets, and "3" meaning exceeds. (Dep. Halferty, Ex. 7, p. 5) The criteria were applied on a "selection matrix." (Dep. Halferty, p. 36)

Ferrang was the sole person applying the criteria to the Commercial Marketing Group. (Dep. Ferrang, pp. 44, 49) He consulted with the District Managers in the sales zones covered by the Industry Managers in the Commercial Marketing Group prior to applying the Reduction in Force (RIF) criteria. (*Id.*, at 53, 57, 91) When he called District Managers, Ferrang did not tell them the reason for his calls. (*Id.*, at 58)

Ferrang heard from Dave Schulz, a District Manager in the Western zone, that "With Phil selling, my guy's aren't buying." (*Id.,* 56-57) Moreover, he interpreted this comment to mean that the sales force was not "buying" what Siligmueller is selling (himself), as opposed to the industrial controls components he was selling. (*Id.*) In addition, Ferrang heard similar comments about Siligmueller's "difficulty connecting" from Ron Gionini, another District Manager in the Western zone. (*Id.* at 64)

Ferrang claims to have observed Siligmueller's failure to forge relationships with the sales force. (*Id.,* at 102-04) He counseled Siligmueller about leveraging his resources. (*Id.*)

When Ferrang completed the rating process, he ranked the employees relative to each other based on the input he received from the District Managers and his own observations. (*Id.,* at pp. 107-1080) After the criteria were applied, Siligmueller was rated the lowest against his peers. (Dep. Halferty, Ex. 7, p. 5) Thomas Meyers, another Industry Manager, was rated second lowest against his peers. (*Id.*) Accordingly, Siligmueller and Myers were selected for discharge during the November 2001 RIF. (Dep. Ferrang, p. 19) After completing the ratings, Ferrang forwarded the selection matrix to Matthew Halferty, Human Resources Supervisor in the Milwaukee facility for review. (Dep. Halferty, p. 76, Dep. Ex. 6)

Halferty input the ratings into a computer program to determine whether the selection of Siligmueller and Meyers revealed a disparate impact based on a legally protected characteristic. (*Id.*)] Halferty learned that 40% (2 out of 5) of the older employees were terminated in the alleged RIF and 0% (0 out of 3)) of the younger employees were terminated. (Dep. Halferty, pp. 84; Ex. 6) Halferty testified in his deposition that, based on his statistics training, the sample size of eight employees is not

large enough to produce statistically significant results. (Dep. Halferty, p. 91)

Ferrang completed a "RIF Notebook" to rationalize and document Siligmueller's selection for the November 2001 RIF. (*Id.*, at 36, 85, Ex. 7) He explained the business rationale for the November 2001 RIF as the Industrial Controls Division falling $46,453,000 short of forecasted operating profit. (Dep. Halferty, Ex. 7, p. 7) Ferrang rationalized his selection of Siligmueller as:

> In order to be successful in the assignment, the Industry Manager must build a strong rapport with the Sales Management team and Sales Engineers who are responsible for getting the job done. The incumbent must exert indirect influence over the selling team . Phil has not demonstrated an ability to do this and is unlikely to do so in the future.

(*Id.*, Dep. Ferrang, pp. 51-53)

Stuhr told Siligmueller that he had been selected for the November 2001 RIF on the night of November 15, 2001. (Dep. Siligmueller, p. 135) Halferty and Stuhr officially notified Siligmueller of his selection for discharge on November 16, 2001. (Dep. Halferty, pp. 10, 43-44) Siligmueller raised the issue of age twice during the November 16 discharge meeting. (Dep. Siligmueller, pp. 138-139) First he asked whether, based on his years of service, he could be "bridged" to early retirement. (*Id.*; Dep. Halferty, p. 43) According to Eaton's policies on bridging, Siligmueller did not have enough years to be eligible for early retirement. (Dep. Halferty, pp. 43-45) Siligmueller was 53 years old at the time of his discharge. (Aff. Spiker, ¶ 9)

Halferty presented Siligmueller with two documents, a severance agreement and an enhanced severance agreement. (Dep. Halferty, pp. 38-39) Siligmueller signed both documents on December 31, 2001. (Dep. Siligmueller, Exs. 23, 24) As part of the enhanced severance agreement, Siligmueller was eligible to participate immediately in

outplacement services provided by Eaton. (Dep. Siligmueller, Ex. 24) Siligmueller took advantage of the outplacement services from November 16, 2001, through January 7, 2002. (Dep. Siligmueller, p. 144) On January 7, 2002, Siligmueller revoked his acceptance of the enhanced severance agreement. (Dep. Halferty, p. 38; Dep. Siligmueller, Ex. 25)

Following the November 2001 RIF, the two national industries covered by Siligmueller, Man Lift and Car Wash, were no longer pursued actively by any employee. (Dep. Halferty, Ex. 7, p. 7; Dep. Ferrang, pp. 41-43, 97-98) The Man Lift and Car Wash industries were not as profitable as the other national industries targeted by the Commercial Marketing Group. (Dep. Ferrang, pp. 41-42) Siligmueller's responsiblities to the Western zone were divided between Stuhr and Hevey in the Milwaukee office. (*Id.*, at 97; Dep. Halferty, Ex. 1, p. 2) Both Stuhr and Hevey are older than Siligmueller. (Dep. Halferty, Ex. 1, p. 2) Neither services the Western zone proactively, rather, they are reactive to questions from the Western zone. (Dep. Ferrang, p. 97; Dep. Halferty, p. 55) Further, no person filled Siligmueller's position as Industry Manager for the Western zone (Dep. Ferrang, pp. 19-20) and the number of employees in the Commercial Marketing Group dropped to four in 2002.

## ANALYSIS

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To succeed on a discrimination claim under the ADEA, a plaintiff must show that his termination or other adverse employment action would not have occurred "but for" his employer's motive to discriminate against him on the basis of his age. *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir. 1995).

A plaintiff may prove unlawful discrimination by presenting direct evidence of an impermissible motive, or indirectly using the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). The *McDonnell Douglas* framework requires that the plaintiff first establish a prima facie case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. To establish a prima facie case of age discrimination under the indirect method, a plaintiff must show that: (1) he is a member of a protected class (age forty and over); (2) he was performing at a level that met his employer's legitimate expectations; (3) he was subject to an adverse employment action; and (4) he was treated differently than a similarly situated person outside the protected class. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002)

If the plaintiff makes a prima facie case it creates a presumption of discrimination that forces his employer to show a legitimate non-discriminatory reason for its adverse employment action. *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1122 (7th Cir. 1994). When the employer presents a legitimate non-discriminatory reason for its decision, the burden shifts back to the plaintiff to show that the employer's reasons are pretextual. *Denisi v. Dominick's Finer Foods, Inc.,* 99 F.3d 860, 864 (7th Cir. 1996). To show pretext in a reduction in force case, an employee must establish that an improper motive "tipped the balance" in favor of discharge. *Krchnavy,* 294 F.3d at 876.

Siligmueller does not have direct evidence of age discrimination, and therefore must rely on indirect evidence. Under the burden shifting method, Siligmueller easily satisfies the first three elements of a prima facie case. First, at 53, he was a member of a protected class at the time of termination. Second, he presented evidence that he was performing his job satisfactorily. Third, he was fired on November 16, 2001.

However, with regard to the fourth element, Siligmueller must show that he was treated less favorably than younger, similarly situated employees.

At the time of the November 2001 reduction in force, the Commercial Marketing Group retained five of its seven managers. Three of the five were in their thirties (30, 33, and 36), and the remaining two were older than Siligmueller (56 and 58). Eaton terminated Siligmueller and Meyers, ages 53 and 47 respectively. There is no dispute that all seven managers were "similarly situated," had similar roles, and performed similar work. (Plaintiff's Brief, p. 5)

Although older employees were retained, Siligmueller attempts to satisfy this fourth element by arguing that the younger employees actually assumed responsibility for his work. He cites the Reduction in Force Notebook dated November 16, 2001, which states that work will "be divided among the remaining industry managers and the regional marketing manager." Also, the Notebook reads that "focus for target accounts will be limited to the largest Cities in the Western Region" and that "focus on the Man Lift Industry will be eliminated entirely."

The uncontroverted evidence in the record establishes that the work was not divided among the industry managers and the regional manager. Rather, Stuhr (age 56) assumed 95% of Siligmueller's responsibilities, and Hevey (age 58) assumed the remaining 5%. Siligmueller acknowledged in his deposition that the work was distributed only to the two older remaining managers. (Dep. Siligmueller, p. 146)

Eaton does indicate that it will not dispute Siligmueller can establish a prima facie case of age discrimination for purposes of this motion, even though this is a close case. That shifts to Eaton the burden of articulating a legitimate, nondiscriminatory reason for discharging Siligmueller. Eaton has met its burden.

Based on the annual report attached to the Amended Affidavit of Amy Spiker, it is clear that 2001 was a financially difficult year for Eaton. Net sales fell over $1 billion. To compensate for the loss in sales, Eaton undertook a restructuring and in 2001 closed 17 manufacturing plants and reduced its total employment by 18%. Ferrang has testified that he was instructed to discharge two people from his Commercial Marketing Group. He undertook this assignment by ranking the employees based on corporate criteria applied to RIFs and interviews with District Managers. As a consequence, Ferrang ranked Siligmueller and Meyers the lowest.

Siligmueller argues that "Eaton has failed to prove that there was in fact a RIF or that the economy was poor in any way relevant to the segment of Eaton's business in which Mr. Siligmueller operated or that Eaton's operating revenues were down or, if they were, how this could have effected or did effect Mr. Siligmueller's department." However, Siligmueller testified that he heard in 2001 that reductions were being considered in his group. (Dep. Siligmueller, pp. 113-14, 124-129) Also, he testified that he had no basis to refute the budget shortfall projections outlined in the Reduction in Force Justification Sheet. (Dep. Siligmueller, pp. 113-14, 124-129; Dep. Halferty, Ex. 7, p. 7) Further, Siligmueller was aware that a woman (age 28) in the Commercial Marketing Group had been laid off earlier that same year. (Dep. Siligmueller, pp. 128-129)

Therefore, to avoid summary judgment, Siligmueller must establish that the stated reasons are pretextual. It is insufficient to accuse Eaton or Ferrang of dishonesty, *Schuster v. Lucent Technologies, Inc.,* 327 F.3d 569, 578 (7th Cir. 2003), to show that "the employer made a mistake or that the employer's reason was not good enough to support its decision." *Balderston v. Fairbanks Moore Engine*, 328 F.3d 309, 323 (7th Cir. 2003). Rather, "plaintiffs must provide evidence tending to prove that the employer's reasons are

factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge, and that plaintiff would not have been let go but for his age." *Id.*

Siligmueller argues that Ferrang failed to document Siligmueller's alleged shortcomings in any way. He believes that Ferrang has distorted comments by District Managers regarding Siligmueller's inability to connect with people. Finally, Siligmueller maintains that the rationale for firing him is contradictory.

Company policy required annual evaluations. However, Ferrang failed to evaluate Siligmueller after hiring him in 2000. Siligmueller was fired for failing to actively and effectively cultivate the sales force but after his termination, the company changed its approach from proactive to reactive.

The court will first address the arguments regarding job performance. Eaton is accused of "cherry picking" comments from performance appraisals dating back to 1984. However, Eaton has never maintained that Siligmueller was a poor performer. He was consistently rated as competent, and, on several occasions received a commendable rating. At the same time, he was urged to focus on connecting with people and developing leadership skills. Therefore, it is not surprising in selecting Siligmueller for the reduction in force, that Ferrang commented:

> In order to be successful in this assignment, the Industry Manager must build a strong rapport with the Sales Management team and Sales Engineers who are responsible for getting the job done. The incumbent must exert indirect influence over the selling team. Phil has not demonstrated an ability to do this and is unlikely to do so in the future.

(Aff. Kruse, Ex. F) Siligmueller's own assessment of his performance is insufficient to create an issue of fact. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th

Cir.1994) (finding that employee's self-interested assessment of her own job abilities is insufficient to raise an issue of fact).

Siligmueller submits that Ferrang told the HR Department that he evaluated Siligmueller when he had not done so, and that no managers or sales persons with whom Siligmueller worked directly communicated a failure to connect or to forge relationships with the general sales force. In his affidavit, Siligmueller explains that the comment attributed to Dave Schulz ("With Phil selling, my guy's aren't buying") was based on Schulz's preference for selling Westinghouse products over the industrial controls components from Eaton. In addition, Siligmueller attaches a series of e-mails to demonstrate that Schulz was "not interested in meeting with either Mr. Ferrang or me and did not want us to come to the meetings with sales people in his area to meet with local managers and sales personnel." Notably, Siligmueller does not attack the Schulz statement but rather Ferrang's interpretation of the statement. In any event, Siligmueller's affidavit and e-mails support Ferrang's position that Siligmueller was not connecting with his sales force.

That Ferrang did not document every shortcoming is not evidence that Siligmueller's age played any role in the decision to terminate his employment. Nor is it significant that Ferrang told HR that he completed the early 2001 evaluation. While shifting and inconsistent explanations can provide a basis for a finding of pretext, *see Stalter v. Wal-Mart Stores*, 195 F.3d 285, 291 (7th Cir.1999), the explanations must actually be shifting and inconsistent to permit an inference of mendacity. *See Rand v. CF Indus.*, 42 F.3d 1139, 1146 (7th Cir.1994) (noting that summary judgment in favor of the employer is proper if the proffered explanations are consistent "in substance if not word choice"). Here, the proffered reasons for Siligmueller's termination have never changed. Moreover,

Ferrang testified that he believed that he had completed a performance evaluation, that he had discussions with District Managers on a regular basis, and that he applied criteria utilized by Eaton in deciding to terminate Siligmueller and Meyers. In addition, the Reduction in Force Notebook is consistent with Ferrang's testimony that the decision making process commenced the week of November 5, 2001, and culminated with the termination on November 16, 2001.

As a final matter, the argument regarding the shift in the Western zone from a proactive to reactive sales force is circuitous rather than contradictory. It makes sense that the focus of the Commercial Marketing Group would shift from proactive to reactive after it lost three of its eight employees due to reductions in force within a six-month period. With portions of Siligmueller's position eliminated and the remaining duties reduced or redistributed, the sales force no longer had the personnel to call on sales prospects in the Western zone.

Ultimately, when forced to reduce costs, management must make difficult decisions. A qualified employee may be let go. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed.2d 338 (1993); *Anderson v. Baxter Healthcare Corp*. 13 F.3d 1120, 1125-26 (7th Cir. 1994). As long as the decision to terminate is not motivated by an impermissible discriminatory purpose, it is not the court's role to second-guess difficult management decisions. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997); *see also McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers.") .

Now, therefore,

IT IS ORDERED that defendant's motion for summary judgment is granted.

IT IS FURTHER ORDERED that this case be dismissed.

Dated at Milwaukee, Wisconsin, this 30th day of December, 2005.

BY THE COURT

s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
U. S. District Judge